15-832-cv
Salazar v. King

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2015

(Argued: November 4, 2015   Decided: May 12, 2016)

Docket No. 15-832-cv

ANA SALAZAR, MARILYN MERCADO, ANA BERNARDEZ, JEANNETTE POOLE, LISA BRYANT, CHERRYLINE STEVENS, EDNA VILLATORO, on behalf of themselves and others similarly situated,

*Plaintiffs-Appellants*,

— v. —

JOHN B. KING, JR., in his official capacity as Secretary of the United States Department of Education,[*]

*Defendant-Appellee*.

B e f o r e:

HALL and LYNCH, *Circuit Judges*, and RAKOFF, *District Judge*.[**]

[*] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Secretary of the United States Department of Education John B. King Jr. is automatically substituted for former Secretary of the United States Department of Education Arne Duncan as Respondent.
[**] The Honorable Jed S. Rakoff, of the United States District Court for the Southern District of New York, sitting by designation.

––––––––––––––––

Plaintiffs-Appellants, former students of for-profit beauty schools operated by Wilfred American Educational Corporation ("Wilfred"), claim that Wilfred schools fraudulently certified their eligibility for federal student loans. Plaintiffs brought this class action on behalf of themselves and similarly situated Wilfred borrowers against the United States Department of Education ("DOE"), alleging that, despite regulations that require the DOE to temporarily suspend the collection of loans and notify borrowers of their discharge rights when a borrower "may be eligible for a discharge" because of a school's fraudulent certification of the student's eligibility to borrow, the DOE arbitrarily and capriciously refused to provide this relief to the putative class members. The district court granted the DOE's motion to dismiss, holding that the DOE's actions were unreviewable because they were committed to agency discretion by law, and were not final. The district court then denied the plaintiffs' motion for class certification as moot. Because we hold that there is sufficient law to apply and that the challenged decisions of the DOE were final, we VACATE the decision of the district court granting the defendant's motion to dismiss and denying plaintiffs' request for class certification as moot, and REMAND for proceedings consistent with this decision, including consideration of plaintiffs' class certification motion.

VACATED AND REMANDED.

––––––––––––––––

EILEEN CONNER (Beth E. Goldman, Jane Greengold Stvens, Danielle Tarantolo, Jason Glick, *on the brief*), New York Legal Assistance Group, New York, NY, *for Plaintiffs-Appellants*.

CHRISTINA S. POSCABLO (Ellen London, Emily E. Daughtry, *on the brief*), for Preet Bharara, United States Attorney for the Southern District of New York , New York, NY, *for Defendant-Appellee*.

Toby R. Merrill, Legal Services Center of Harvard Law School, Jamaica Plain, MA, *for* Amici Curiae East Bay Community Law

2

Center, Legal Services Center of Harvard Law School, National Consumer Law Center, New Economy Project, *in Support of Plaintiffs-Appellants*.

———————

GERARD E. LYNCH, *Circuit Judge*:

Plaintiffs-Appellants Ana Salazar, Marilyn Mercado, Ana Bernardez, Jeannette Poole, Lisa Bryant, Cherryline Stevens, and Edna Villatoro, ("plaintiffs") brought this class action against Defendant-Appellee Arne Duncan, in his official capacity as the Secretary of the United States Department of Education ("DOE").[1] Plaintiffs allege that federal student loans were fraudulently procured on their behalf when the Wilfred American Educational Corporation's ("Wilfred") for-profit beauty schools falsely certified that plaintiffs had an ability-to-benefit ("ATB") from the education they received from Wilfred. Plaintiffs allege that the DOE's refusal to temporarily suspend collection of the student loan debt of putative class members, and refusal to send them notice of their potential eligibility for a discharge, was arbitrary and capricious in violation of the Administrative Procedure Act ("APA"). The United States District Court for the Southern District of New York (Robert W. Sweet, *Judge*) granted the

———————
[1] Since this litigation began, Secretary Duncan resigned. John B. King, Jr., who succeeded him as Secretary of Education has also replaced him as the defendant in this case.

DOE's motion to dismiss, holding that plaintiffs had not adequately alleged a final agency action that may be subject to judicial review. Because the district court dismissed the complaint, it also denied plaintiffs' motion for class certification as moot.

As a preliminary matter, the DOE argues that the case has become moot because all the named plaintiffs' Wilfred loans have now been discharged. We have jurisdiction to review this case because the plaintiffs had standing when they filed their class action complaint and this case fits into the narrow exception to the mootness doctrine for class action claims that are "inherently transitory." Exercising our jurisdiction to review plaintiffs' APA challenge, we hold that plaintiffs are entitled to judicial review because there is sufficient law to apply to the challenged agency decisions. The text of the relevant statute directs that the DOE "shall" discharge a borrower's loan liability when a school has falsely certified a student's ATB. DOE's regulations and informal agency guidance direct that the DOE "shall" temporarily suspend collection on loans and notify borrowers of their possible eligibility for a discharge when the DOE has reliable information that a borrower "may be eligible" for dicharge. We therefore hold that plaintiffs' claims are judicially reviewable under the APA. Accordingly, we

VACATE the judgment of the district court and REMAND the case for further proceedings consistent with this decision.

## BACKGROUND

I.    Statutory and Regulatory Structure of Student Loan Discharge

Title IV of the Higher Education Act of 1965 ("HEA"), 20 U.S.C. §§ 1070-1099, provides the statutory authorization for federal student loans, including both Federal Family Education Loans ("FFEL"), id. § 1071 et seq.,[2] and William D. Ford Federal Direct Loans ("Direct Loans"), id. § 1087a et seq.  Under the FFEL program, private lenders issue subsidized student loans, which are then insured by guaranty agencies (a state or private non-profit organization), which, in turn, are insured by the DOE.  Id. § 1078(b)–(c); 34 C.F.R. § 682.200 (defining guaranty agency).  Under the Direct Loans program, the government lends money to students directly.

To qualify for federal educational financial assistance under either loan program, a student must attend an eligible institution and must have a high school diploma or recognized equivalent.  If the student lacks a diploma, the institution must demonstrate the student has an ATB from the training that she

---

[2] Since July 2010, loans are no longer made under the FFEL program.  See Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, § 2201 et seq., 124 Stat. 1029, 1074 et seq.

would receive using the financial aid. 20 U.S.C. §§ 1091(a), (d). The particulars of how a school must demonstrate that the student has an ATB have changed over the years; however, a student generally must pass a standardized test. See 34 C.F.R. § 668.32(e); U.S. Dep't of Educ., GEN-95-42, Dear Colleague Letter, at 2 (Sept. 1995) ("DCL 95-42") (summarizing changes in ATB requirements between 1986 and 1995).

The ATB test, which between 1987 and 1991 was based on criteria developed by private accrediting agencies and could be administered and evaluated by the school itself, proved to be a target of fraud; some schools falsified results or never even gave prospective students the test. See U.S. Dep't of Educ., GEN-89-55, Dear Colleague Letter, at 4 (Dec. 1989). Although after 1991, the ATB tests had to be approved by the DOE and independently administered, and after 1992 the DOE specified a required score, fraudulent ATB testing continued unabated. See U.S. Dep't of Educ., GEN-91-20, Dear Colleague Letter, at 1-2 (June 1991); DCL 95-42 at 2; U.S. Gov't Accountability Office, GAO-09-600, Proprietary Schools: Stronger Department of Education Oversight Needed to Help Ensure Only Eligible Students Receive Federal Student Aid 22 (2009) ("Through separate investigations at proprietary schools, we, along with

6

other federal and state investigative agencies, found test administrators or school officials violating rules to ensure prospective students without high school diplomas passed required tests and obtained access to Title IV aid.").

Similarly, the Senate Permanent Subcommittee on Investigations Report found that students were the victims of "unscrupulous and dishonest school operators" of private, for-profit trade and other vocational institutions that provide postsecondary education that "leav[e] them with huge debts and little or no education." Abuses in Federal Student Aid Programs, S. Rep. 102-58, at 10 (1991). The subcommittee also found that "a virtually complete breakdown in effective regulation and oversight had opened the door for fraud, abuse, and other serious problems at every level." S. Rep. 102-58, at 11.

In response to these findings of pervasive fraud in federal student loans and contentions of lack of adequate supervision by DOE, Congress passed a statute in 1992 directing that the Secretary of the United States DOE ("Secretary") "*shall* discharge the borrower's liability on the loan (including interest and collection fees) by repaying the amount owed on the loan" if the borrower received a federal student loan on or after January 1, 1986, and the "student's eligibility to borrow under this part was falsely certified by the eligible

institution." Pub. L. No. 102-325 § 437 (July 23, 1992), codified at 20 U.S.C. § 1087 (emphasis added). Additionally, the statute provides that a "borrower whose loan has been discharged pursuant to this subsection shall not be precluded from receiving additional grants, loans, or work assistance . . . for which the borrower would be otherwise eligible" and that the borrower must have her adverse credit history repaired. 20 U.S.C. § 1087(c)(4), (5).

To implement the statute, the Secretary issued two similar regulations, one to govern the FFEL program and one to govern the Direct Loans program. Both state that the Secretary "*shall* discharge the borrower's liability on [a] loan" made after 1986 when the "student's eligibility to borrow under this part was falsely certified." Id. § 1087(a)(1), (c)(1); see 34 C.F.R. § 682.402(e) (governing discharge of FFEL program loans due to false certification); 34 C.F.R. § 685.215 (governing discharge of federal Direct Loans due to false certification). These regulations include obligations to ensure that the congressional directive is fulfilled by the guaranty agencies that administer the FFEL program and by the DOE, which is the final insurer of the FFEL program and administers the Direct Loans program.

The regulation governing the FFEL program provides that

> [i]f the guaranty agency receives information *it believes to be reliable* indicating that a borrower whose loan is

held by the agency *may* be eligible for a discharge under paragraph (e) ["False certification by a school of a student's eligibility to borrow"] of this section, the agency *shall immediately suspend* any efforts to collect from the borrower on any loan received for the program of study for which the loan was made (but may continue to receive borrower payments), and *inform* the borrower of the procedures for requesting a discharge.

34 C.F.R. § 682.402(e)(6)(ii) (emphasis added). Although it speaks of "the guaranty agency," that regulation also implicates the obligations of the DOE because, as our Court has recognized, "[i]t is the obligation of the Department of Education to see that [the role of guaranty agencies] is properly performed." McNamee, Lochner, Titus & Williams, P.C. v. Higher Educ. Assistance Found., 50 F.3d 120, 124 (2d Cir. 1995). The DOE accepts that the FFEL regulation also applies to the DOE for the purposes of this litigation.[3]

Another regulation speaks directly to the DOE's obligations under the Direct Loan program, stating:

---

[3] In its brief, the DOE stated that "[w]hile certain of the FFEL regulations relevant to the issues in this litigation and relied on by the [p]laintiffs appear, on their face, to apply only to the guaranty agencies, DOE has not taken the position in this case that those regulations do not apply to DOE," because "DOE retains the ultimate discretion to grant or deny a discharge application. . . . And, as the ultimate guarantor of the loans at issue, DOE often steps into the shoes of the guaranty agencies . . . [and] DOE manages the FFEL and Direct Loan programs as a whole." Defendant-Appellee's Br. 8-9 n.4 (citation omitted).

If the Secretary determines that a borrower's Direct Loan *may* be eligible for a discharge under this section, the Secretary *mails* the borrower a disclosure application and an explanation of the qualifications and procedures for obtaining a discharge. The Secretary also *promptly suspends* any efforts to collect from the borrower on any affected loan. The Secretary may continue to receive borrower payments.

34 C.F.R. § 685.215(d)(1) (emphasis added). Although the language in the two regulations is slightly different, the DOE has acknowledged that the "FFEL and Direct Loan regulations on false certification discharges have the same rules with respect to a discharge based on an improper determination of the student's ability-to-benefit." Federal Family Education Loan (FFEL) Program and William D. Ford Federal Direct Loan Program, 65 Fed. Reg. 46,316, 46,318 (proposed July 27, 2000) (to be codified at 34 C.F.R. pts. 682, 685).[4]

In addition to the statute and regulations, the DOE has issued Dear Colleague Letters ("DCLs") to provide additional guidance about discharges based on a school's fraudulent determination of a student's ATB. Two DCLs provide specific guidance concerning the evidence that guaranty agencies and

---

[4] Relatedly, but not directly at issue in this appeal, the DOE has also issued a "group discharge" regulation. Pursuant to this regulation, the Secretary has the power to discharge a borrower's loan without an individual application from the borrower if the Secretary determines that the borrower is qualified for a discharge based on information in the Secretary's or guaranty agency's possession. 34 C.F.R. §§ 682.402(e)(15), 685.215(c)(7).

10

the DOE should consider to determine whether a borrower's ATB was falsely certified and thus whether the loan should be discharged. DCL 95-42; U.S. Dep't of Educ., FP-07-09, Dear Colleague Letter (Sept. 2007) ("DCL 07-09").

The Secretary, as the head of the DOE, is required to try to collect federally guaranteed student loan debt. See 31 U.S.C. § 3711(a)(1). The Secretary is authorized to take a variety of actions in order to collect a debt, including charging interest, fees, and penalties; reporting debts to consumer reporting agencies; garnishing wages; and imposing "offsets." 34 C.F.R. §§ 30.1, 30.21, 30.33, 30.35, 34.1. Imposing an offset allows an administrative agency to withhold government funds otherwise due to an individual, such as social security payments or tax refunds, to pay an outstanding debt owed to the government. See, e.g., Lockhart v. United States, 546 U.S. 142, 143-44 (2005) (upholding the government's withholding of individual's social security payments to offset a debt owed on a federally reinsured student loan incurred between 1984-1989). The DOE's regulations require that when garnishing wages or imposing an offset the Secretary must provide written notice to the debtor with certain enumerated information. 34 C.F.R. §§ 30.22, 34.5. The regulations

11

do not require this notice to include any information about the possibility of discharging debt that was incurred through fraudulent certification.

II.    Factual Background[5]

Plaintiffs are former students of a (now-defunct) chain of for-profit beauty schools run by Wilfred.  Each alleges that Wilfred fraudulently certified that she was eligible for federal student aid by falsely certifying that she had the ATB from a Wilfred program.  All of their loans were initiated under the FFEL program; however, some borrowers later consolidated their FFEL loans under the Direct Loan program.  Plaintiffs allege that the DOE knows that Wilfred fraudulently certified the eligibility of a large percentage of borrowers, but has failed to notify plaintiffs that they may be eligible for relief and has continued to collect on their loans.  Plaintiffs brought this action on behalf of themselves and a proposed class consisting of "many thousands of individuals" whose eligibility for federal student loans was falsely certified by the Wilfred schools beginning in 1986.  JA 20 ¶ 48.

---

[5] All facts are taken from plaintiffs' complaint, and because plaintiffs appeal from an order granting a motion to dismiss, we accept all factual allegations in the complaint as true.  ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 93 (2d Cir. 2007).

Wilfred began as a small chain of schools offering vocational training in beauty-related professions. By the late 1980s, it had expanded to a nationwide chain of 58 campuses, with over 11,000 students enrolled annually. Between 1980 and 1989, Wilfred received $405 million in federal student aid, which accounted for between 80 and 90 percent of Wilfred's revenue. According to the DOE, at least 61,300 FFEL program loans were issued to Wilfred students between 1986 and 1994. Plaintiffs allege that "Wilfred targeted and recruited immigrants and economically disadvantaged individuals for enrollment in its schools." JA 22 ¶ 63.

The facts alleged by the named plaintiffs include examples of the fraud that plaintiffs allege is common to the class. According to the complaint, not one of the named plaintiffs was ever asked if she had a high school diploma or its equivalent. Further, no named plaintiff was given a test to determine if she had the "ability to benefit" from the Wilfred program, as required in lieu of a high school diploma. Several plaintiffs allege that the Wilfred campus they attended was closed without advance notice, making it impossible for them to complete the program.

Each named plaintiff has a student loan that was paid directly to Wilfred. Each had her federal income tax refund seized to pay the debt on her student loan at the direction of the DOE, and at least one also had her wages garnished at the direction of the DOE. At the time the lawsuit was filed, all named plaintiffs continued to be burdened with the responsibility for their loans and to suffer consequences of that indebtedness. Many allege that the Wilfred student debt ruined their credit scores, making it impossible for them to obtain credit to pay for basic necessities. Outstanding Wilfred debt has also made plaintiffs unable to access educational opportunities decades after they were the victims of fraud.

A.   The Named Plaintiffs

Plaintiff Ana Salazar alleges that she was recruited to attend Wilfred in late 1988. She did not have a high school diploma or its equivalent and was not given an ATB test. Salazar did not speak English, but was told she qualified and was given forms to sign in English. The Wilfred school she attended closed without warning, and she was unable to finish the program. She made payments toward her Wilfred debt for thirteen years, pursuant to a payment plan arranged with collectors of the debt. The IRS seized her federal income tax refund approximately five times at the direction of the DOE. Salazar never received any

14

communication from the DOE informing her of the availability of a false certification discharge. She applied to the DOE for a loan discharge on April 9, 2014 and her discharge was granted on September 23, 2014.

Plaintiff Marilyn Mercado dropped out of school in junior high and enrolled in Wilfred Academy at age seventeen. She did not have a high school diploma or its equivalent and was not given an ATB test. Although she completed the program, she was unable to obtain a job as a hair cutter, the field that Wilfred purported to train her for, because she was not adequately trained to cut hair and not prepared to pass the cosmetology license test. Mercado ultimately defaulted on the debt. She is not able to obtain an extension of credit, and the IRS seized her federal income tax refund to pay the debt. She never received any communication from the DOE informing her of the availability of a false certification discharge. Mercado applied to the DOE for a loan discharge on April 9, 2014, and her discharge was granted on June 9, 2014.

Plaintiff Ana Bernardez alleges that she inquired about a Wilfred educational program in 1988, and she was told that the only requirement for enrollment was a Social Security number, and that it would cost only a few hundred dollars. Bernardez did not have a high school diploma or its equivalent

15

and was not given an ATB test. She did not understand that she had taken out a loan until she tried to obtain a loan years later to cover the cost of furniture. The IRS seized her federal tax refunds approximately five times. She never received any communication from the DOE informing her of the availability of a false certification discharge. Bernandez applied to the DOE for a loan discharge on April 9, 2014, and her discharge was granted on October 14, 2014.

In 1987, plaintiff Jeannette Poole gave her personal information to a representative of the Wilfred Academy, who said he would use it to determine if she qualified for loans to cover the cost of the program. Poole did not have a high school diploma or its equivalent and was not given an ATB test. After receiving information from the Wilfred representative, she told the representative that she did *not* want to enroll in the program or take out a loan. (She was homeless and sleeping in an abandoned building at the time and did not want to take on debt). Even though she never attended any Wilfred program, Wilfred took out two loans in her name without her knowledge. Because these loans went into default, Poole was unable to enroll in a business training program at a community college over a decade later. Further, her credit was impaired so she was not able to receive credit for necessities such as

16

repairing her living quarters damaged by a flood. Additionally, the IRS seized her federal tax refund despite her attempts to contest the loan. She never received any communication from the DOE informing her of the availability of a false certification discharge. Poole applied to the DOE for a loan discharge on April 9, 2014, and her discharge was granted on May 20, 2014.

Plaintiff Edna Villatoro enrolled in a Wilfred Academy in New Jersey. She did not have a high school diploma or its equivalent and was not given an ATB test. The Wilfred representative told Villatoro that the school offered GED classes, but a GED teacher was never provided. After completing the Wilfred program, Villatoro learned that to apply for a cosmetologist license in New Jersey she needed a high school diploma or its equivalent. She never obtained a license. The IRS seized her federal income tax refund. She never received any communication from the DOE informing her of the availability of a false certification discharge. Villatoro applied to the DOE for a loan discharge to the DOE on April 9, 2014, and her discharge was granted on June 17, 2014.

Plaintiff Lisa Bryant attended a Wilfred school in Houston, Texas in 1987. She did not have a high school diploma or its equivalent and was not given an ATB test. A Wilfred representative told Bryant that if she did not find a job

within six months after graduation her loan money would be refunded. She attended the school for three months, until one day she arrived for class and was told by a security guard that the school was closed. She never received any correspondence about the closure. The IRS seized Byrant's federal income tax refunds at least four times. She never received any communication from the DOE informing her of the availability of a false certification discharge. She has never been able to obtain a credit card or take out a loan to buy a car or a home because of the Wilfred debt. Bryant applied to the DOE for a loan discharge on May 28, 2014, and her discharge was granted on June 27, 2014.

Plaintiff Cherryline Stevens enrolled in a Wilfred school in Queens, New York in 1987. Stevens did not have a high school diploma or its equivalent and was not given an ATB test. Although she completed the program, the school never gave her an official diploma, which is necessary to get a cosmetologist license. Approximately eight years ago, Stevens started working at Queens Village Day Care and the DOE garnished her wages to pay her student debt. She has also had her federal tax refund seized at least three times. She never received any communication from the DOE informing her of the availability of a false certification discharge. At the time the lawsuit was filed Stevens was continuing

18

to make monthly payments towards her student debt. Stevens applied to the DOE for a loan discharge on April 9, 2014, and her discharge was granted on June 18, 2014.

B.     The Class Allegations

The DOE estimates that over 61,300 student loans were given to individuals to attend Wilfred schools. Plaintiffs allege that their factual allegations are common to the class and that the claims of the named plaintiffs are typical of the claims of the class because Wilfred "routinely falsely certified students as eligible for federally guaranteed student loans even though the certified students did not have a valid high school diploma or GED, and Wilfred did not give them ability to benefit [] tests" and "certified that the students had taken and passed an approved ATB test when they had not." JA 23 ¶¶ 66, 67. All members of the putative class suffered harm because they paid money towards the debt; incurred interest, penalties and collection fees; had their federal income tax refunds seized and/or their wages garnished; and had their credit damaged. Plaintiffs also allege that "the majority of class members are, and have always been, unaware of the availability of a false certification discharge," that "Defendant has or had information in his possession

19

demonstrating that specific loans were falsely certified by Wilfred," and that the DOE had and has "knowledge of Wilfred's bad practices, including its pattern of falsely certifying students' loan eligibility," and "information indicating that current or former Wilfred borrowers may be eligible for a discharge." JA 30-31 ¶ 122-126.

In support of the motion for class certification, plaintiffs' counsel avers that counsel spoke with fifty individuals whose eligibility for federally guaranteed students loans was falsely certified by ten different Wilfred schools, and that "[n]one of these individuals had been aware of the existence of the false certification discharge or that they were qualified for a false certification discharge of their federally guaranteed Wilfred loans until they were referred to [counsel], or until [counsel] advised them of it." JA 54-55.

C.    The DOE's Investigation of Wilfred

The DOE began investigating Wilfred's fraud as early as the 1980s. In 1982, the DOE found five Wilfred schools ineligible for continued participation in the federally guaranteed loan program. The DOE's Office of Inspector General ("OIG") investigated the financial aid practices of Wilfred's schools in Massachusetts in 1983, Wilfred's Florida schools in 1985, and Wilfred's schools

nationwide by 1986. The OIG and the United States Department of Justice ("DOJ") formed a joint federal task force to investigate Wilfred's principals and employees. The DOJ brought criminal prosecutions against Wilfred, its officers, and individual employees for financial aid fraud, false certification, racketeering, wire fraud, embezzlement, making false statements, and other crimes, resulting in the conviction of Wilfred, along with its president and other employees, for financial aid fraud and defrauding the federal government. In December 1988, the DOE attempted to terminate fifty-eight Wilfred schools from the federally guaranteed loan program, but this attempt was defeated on procedural grounds. Wilfred filed for Chapter 11 bankruptcy in May 1990, and the last Wilfred school ceased operation in 1994.

In 1996 the DOE issued a report titled "Documentation of ATB violations," based on OIG reports of approximately 50 Wilfred schools. JA 187. The report concluded that Wilfred's "[c]onsistent pattern of gross violations of DOE regulations in multiple programs over multiple years indicates a strong resistance to following DOE regulations for administering funds and ATB student testing. Violations appeared system wide." JA 188. The report recommended that "[s]ince the corporation was cited as early as June 1984 for

21

improper grading practices it is recommended that all ATB applications be discharged." Id.

Due to these widespread findings of fraud in Wilfred schools, the DOE has a policy of "granting all facially valid [discharge] claims from Wilfred students." JA 216 (Letter from Chad Keller, Supervisory Program & Mgmt. Analyst, Fed. Student Aid, U.S. Dep't of Educ., to Jane Greengold Stevens, Dir. of Litig, N.Y. Legal Assistance Grp. (Feb. 18, 2014)); see JA 200 ¶ 16 (Declaration of Chad Keller). But with the exception of former students who attended the Philadelphia campus of Wilfred between July 1, 1987 and 1989, the DOE has refused to temporarily cease collection on federally guaranteed student loans attributable to Wilfred or to notify all students who attended Wilfred schools of their potential eligibility for a permanent discharge if the school falsely certified their ATB. See JA 216; JA 212-14 (Letter from Janet Greengold Stevens, Dir. of Litig., N.Y. Legal Assistance Grp., to Arne Duncan, Sec'y of Educ., U.S. Dep't of Educ. (Sept. 24, 2013)). The DOE has also continued to actively collect on loans made to former Wilfred students, including by seizing their income tax refunds, garnishing the wages, and tarnishing their credit.

III.    Procedural History

Plaintiffs filed this action on behalf of themselves and similarly situated

Wilfred borrowers, alleging that the DOE violated the APA by arbitrarily and

capriciously refusing to suspend collection on the Wilfred loans and to notify

Wilfred borrowers of their discharge application rights.[6]  Plaintiffs moved to

certify a class of all individuals who obtained federal student loans to attend

Wilfred after January 1, 1986, and whose ATB was falsely certified by Wilfred.

The DOE opposed the motion and moved to dismiss, primarily on the grounds

that the Secretary's actions were unreviewable because they were "committed to

agency discretion by law," 5 U.S.C. § 701(a)(2) and were not "final," id. § 704.

The district court granted the DOE's motion to dismiss and denied plaintiffs'

motion for class certification as moot.  Plaintiffs timely appealed that dismissal.

Prior to oral argument, we asked plaintiffs to provide the current status of

each of the named plaintiffs' applications for false-certification discharge.  Order,

---

[6] Plaintiffs brought other claims which they have explicitly abandoned on appeal, including that the DOE is required to grant a blanket discharge of all Wilfred borrowers' loans without requiring individualized applications, and that the Secretary unlawfully withheld agency action in violation of 5 U.S.C. § 706(1).  See Plaintiffs-Appellants' Br. 14.  These now-abandoned arguments were addressed in the district court's opinion below.  Salazar v. Duncan, No. 14 CIV. 1230 (RWS), 2015 WL 252078, at *14 (S.D.N.Y. Jan. 16, 2015).  The claims plaintiffs present on appeal were adequately raised below and have not been waived.

23

<u>Salazar v. Duncan</u>, No. 15-832 (2d Cir. Oct. 22, 2015), ECF No. 85. Both parties submitted letter briefs. Plaintiffs informed the Court that the discharge applications of all the named plaintiffs had been granted, but that at the time the complaint and amended complaint were filed, "the Named Plaintiffs were still subject to Defendant's collection activities in relation to their loans." Letter Br. for Plaintiffs-Appellants 2, <u>Salazar v. Duncan</u>, No. 15-832 (Oct. 28, 2015), ECF No. 86. Plaintiffs argued that the fact that the DOE had subsequently granted the named plaintiffs' discharge applications did not render their claims moot because their claims come within the mootness exception for inherently transitory claims. <u>Id</u>. The DOE submitted a letter brief arguing that the discharge of the named plaintiffs' loans rendered the appeal moot and that the inherently transitory exception does not preserve jurisdiction because "[t]here is nothing intrinsically fleeting about plaintiffs' claims." Letter Br. for Defendant-Appellee 2, <u>Salazar v. Duncan</u>, No. 15-832 (Oct. 30, 2015), ECF No. 89.

## DISCUSSION

We have jurisdiction to hear this appeal because plaintiffs' claims come within the inherently transitory exception to the mootness doctrine. On the issues before us on appeal, we review the district court's decision to dismiss the

24

plaintiffs' claims de novo and hold that the district court erred.[7] First, the presumption in favor of judicial review applies to this case. Second, there is sufficient law to apply to allow for judicial review of the agency action challenged here. Third, the agency decision was final. See 5 U.S.C. § 704.

I.    The Plaintiffs Have Standing and the Case is Not Moot

To bring a claim under the APA a plaintiff must satisfy Article III's standing requirements (constitutional standing) and assert interests that are arguably within the zone of interests to be protected or regulated by the statute she claims was violated (statutory standing), at all times during the litigation (mootness). See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 132 S. Ct. 2199, 2210 (2012); Nat'l Council of La Raza v. Gonzales, 468 F. Supp. 2d 429, 437 (E.D.N.Y. 2007) aff'd sub nom. Nat'l Council of La Raza v. Mukasey, 283 F. App'x 848 (2d Cir. 2008); Cook v. Colgate Univ., 992 F.2d 17, 19 (2d Cir. 1993).

---

[7] The DOE moved to dismiss the Amended Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The district court granted the DOE's motion without specifying under which subsection the court decided the motion. This court reviews de novo a district court decision granting a motion to dismiss under either subsection of Rule 12(b). Sharkey v. Quarantillo, 541 F.3d 75, 82 (2d Cir. 2008) (Rule 12(b)(1)); Barrows v. Burwell, 777 F.3d 106, 111 (2d Cir. 2015) (Rule 12(b)(6)).

It is not contested that plaintiffs satisfied the requirements for constitutional and statutory standing at the time their complaint was filed. The standing requirements were satisfied because plaintiffs were injured by the DOE's active collection of their student loan debt, their injury was fairly traceable to the refusal of the DOE to suspend collection and send notice, and their injury was redressable. Plaintiffs are student financial aid borrowers who allege that they were falsely certified eligible by Wilfred and thus are squarely within the zone of interests to be protected by a statute directed at the "treatment of borrowers . . . falsely certified as eligible to borrow." See 20 U.S.C. § 1087. However, even if a party has constitutional and statutory standing when her complaint is filed, her claim can become moot during the course of the litigation.

The parties disagree about whether the plaintiffs' case is moot. The DOE granted all of the named plaintiffs' requests to have their Wilfred loans discharged after the plaintiffs filed their complaint and amended complaint. Plaintiffs argue that their claims fall into the mootness exception for inherently transitory claims. The DOE disputes the applicability of the inherently transitory exception to these facts. We agree with the plaintiffs that this case falls into the

26

inherently transitory exception to the mootness doctrine and that they have standing to pursue this appeal.

The exception to the mootness doctrine for "inherently transitory" claims asserted by the named plaintiff(s) in a class action allows such claims to "relate back" to the time of the filing of the complaint with class allegations. See Comer v. Cisneros, 37 F.3d 775, 799 (2d Cir. 1994). Under that exception, a case will not be moot, even if the controversy as to the named plaintiffs has been resolved, if: "(1) it is uncertain that a claim will remain live for any individual who could be named as a plaintiff long enough for a court to certify the class; and (2) there will be a constant class of persons suffering the deprivation complained of in the complaint." Olson v. Brown, 594 F.3d 577, 582 (7th Cir. 2010), citing Gerstein v. Pugh, 420 U.S. 103, 110 n.11 (1975); Zurak v. Regan, 550 F.2d 86, 91–92 (2d Cir. 1977); see Sosna v. Iowa, 419 U.S. 393, 401-02 (1975).[8]

The plaintiffs' claims are within the "inherently transitory" exception. First, it is uncertain that a claim will remain live for any individual who could be

---

[8] Although similar to the "capable of repetition yet evading review" mootness exception in individual litigation, the "inherently transitory" exception is different because the named plaintiff must show "that there will likely be a constant class of persons suffering the deprivation complained of in the complaint" rather than showing that the claim is capable of repetition to that individual plaintiff. Newberg on Class Actions § 2:13 (5th ed. 2014).

named as a plaintiff long enough for a court to address a class certification motion because the DOE processes discharge applications from Wilfred borrowers relatively quickly. For the seven named plaintiffs, the longest time it took for the discharge application to be granted was six months and the average was less than three months. This short time frame does not give a court enough time to consider and decide a motion for class certification. See Robidoux v. Celani, 987 F.2d 931, 939 (2d Cir. 1993) (applying the "inherently transitory" exception to public assistance recipients whose applications for public assistance had been unlawfully delayed). Indeed, it is virtually certain that any class member fortunate enough to learn of the availability of debt relief and to apply for it will be granted a discharge promptly, since it is DOE policy to grant discharges to Wilfred attendees who make a prima facie showing of eligibility without further time-consuming investigation.

Second, there will be a constant class of persons suffering the deprivation complained of in the complaint. The DOE has stated that at least 61,300 FFEL program loans were issued to Wilfred students between 1986 and 1994. Although not all 61,300 Wilfred borrowers will be eligible for a discharge, as not every person who attended Wilfred did so based on a fraudulent certification of

28

her ATB, we can be confident that there is a constant class of persons suffering the deprivation alleged in the complaint, due to the large number of potential class members and the widespread nature of the fraud at Wilfred.

The DOE argues that plaintiffs' claims became moot because plaintiffs "took affirmative steps to procure a discharge of their loans," not because of "the fleeting nature of the conduct giving rise to the claims," and therefore their claims do not fall into the "inherently transitory" exception. Letter Br. for Defendant-Appellee at 2, Salazar v. Duncan, No. 15-832 (Oct. 30, 2015). The "inherently transitory" exception is not so limited.

As this court explained in Comer, "[n]ormally, the Court has held circumstances appropriate where the claims are so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires." 37 F.3d at 799 (internal quotation marks omitted). In Robidoux, we emphasized that the plaintiffs' "claims are inherently transitory since the [Vermont] Department [of Social Welfare] will almost always be able to process a delayed [public assistance] application before a plaintiff can obtain relief through litigation." 987 F.2d at 939.

The critical question for the "inherently transitory" exception to mootness is whether the court will have time to rule on a motion for class certification brought by a plaintiff who has standing to bring a particular claim before the claim will become moot; the inquiry is not *why* the claim will become moot. This case demonstrates why such focus is correct. The DOE suggested at oral argument that the inherently transitory exception does not apply because a borrower could manufacture a non-moot claim by "decid[ing] to delay an application for a discharge." Oral Argument at 1:00:10, <u>Salazar v. Duncan</u>, No. 15-832 (Nov. 4, 2015). The DOE in effect asks plaintiffs to manipulate jurisdiction by forgoing relief to which they are entitled and continuing to suffer garnishment of their earnings and withholding of their income tax refunds.

The inherently transitory exception, which is properly focused on the time it will take for a court to review a claim a plaintiff has standing to pursue, does not require a plaintiff to forgo remedies to which she is entitled in order to seek broader remedies for the DOE's alleged derelictions. If the plaintiffs' allegations prove to be true, to accept the DOE's position would acquiesce in conduct by which the DOE disregards the congressional command to notify victims of fraud and suspend collection activities when it is aware of such frauds, wait for the

30

victims to discover remedies on their own, and then provide them with a quick discharge to avoid exposure of its neglect.[9] That is precisely the sort of situation the inherently transitory exception is designed to correct.

II.    The Presumption Favoring Judicial Review Applies

There is a strong presumption favoring judicial review of administrative action.  Mach Mining, LLC v. EEOC, 135 S. Ct. 1645, 1651 (2015); Block v. Cmty. Nutrition Inst., 467 U.S. 340, 349 (1984).  "From the beginning our cases have established that judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress."  Bowen v. Mich. Acad. of Family Physicians, 476 U.S. 667, 670 (1986) (internal alteration and quotation marks omitted).  In the absence of an express statutory prohibition, the agency "bears the heavy burden of overcoming the strong presumption that Congress did not mean to prohibit all judicial review of [its] decision."  Dunlop v. Bachowski, 421 U.S. 560, 567 (1975).  But the opposite presumption applies when a plaintiff seeks to require that an agency take an enforcement action because "an agency's decision *not* to prosecute or

_____

[9] Moreover, as counsel for the plaintiffs argued, ethical attorneys would have a professional obligation to advise a client that it is in her best interest to apply for a discharge immediately.  See New York State Rules of Professional Conduct, N.Y. Comp. Codes R & Reg. tit. 22 § 1200 (Rule 1.1, "competence"); Oral Argument at 43:30, Salazar v. Duncan, No. 15-832 (Nov. 4, 2015).

enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." Heckler v. Chaney, 470 U.S. 821, 831 (1985) (emphasis added).

The presumption in favor of judicial review applies to this case because plaintiffs challenge what they contend are unlawful actions that the agency has taken, and continues to take, against the plaintiffs themselves. Such challenges are at the core of the judicial review function. The presumption against judicial review of decisions not to take enforcement action protects agency discretion in allocating its resources to choose their enforcement targets. See id. Unlike the plaintiffs in Chaney, who asked the court to compel the FDA to take enforcement measures against third parties within the agency's sphere of regulation, the plaintiffs here ask the court to review whether the DOE acted arbitrarily and capriciously in taking enforcement actions *against plaintiffs*. Plaintiffs would fall within Chaney if they were suing to compel the DOE to take action against Wilfred. They are not; the DOE and the Department of Justice have long since taken action to punish Wilfred. Plaintiffs demand that DOE stop acting to collect from *them* on the loans fraudulently obtained at their expense, as they contend that Congress required.

The DOE argues that the <u>Chaney</u> presumption against judicial review is implicated here, because it should be applied whenever an agency decision "involve[s] a complicated balancing of factors peculiarly within its expertise, such as how best to expend its resources." Defendant-Appellee's Br. 29. We reject this attempt to expand <u>Chaney</u> beyond what its holding and reasoning can bear. In <u>Chaney</u>, the court reasoned that "when an agency refuses to act it generally does not exercise its *coercive* power over an individual's liberty or property rights" and "an agency's refusal to institute proceedings shares to some extent the characteristics of the decision of a prosecutor . . . not to indict." <u>Chaney</u>, 470 U.S. at 832. In this case, the DOE is already exercising its coercive power over the plaintiffs by taking actions to collect on student loan debt.[10]

III. <u>Congress Has Provided Sufficiently Clear Standards for Courts to Apply</u>

The presumption in favor of judicial review is not absolute, but subject to a narrow exception: the APA's prohibition against judicial review of agency action

---

[10] Even if the DOE were correct that the challenged agency action is an enforcement action, the plaintiffs could rebut the presumption against judicial review because, for the reasons discussed below, the relevant statute, implementing guidelines, and agency guidance have provided sufficient law to apply for the agency to follow in exercising its enforcement powers. <u>Chaney</u>, 470 U.S. at 832-33 ("[T]he presumption may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers.").

"committed to agency discretion by law." 5 U.S.C. § 701(a)(2); see Westchester v.

U.S. Dep't of Hous. & Urban Dev., 778 F.3d 412, 419 (2d Cir. 2015). We must

therefore consider whether the statutes and regulations at issue in this case "are

drawn in such broad terms that . . . there is no law to apply." Id.

To determine whether there is "law to apply" that provides "judicially

manageable standards" for judging an agency's exercise of discretion, the courts

look to the statutory text, the agency's regulations, and informal agency guidance

that govern the agency's challenged action. Westchester, 778 F.3d at 419;

Chaney, 470 U.S. at 830. Agency regulations and guidance can provide a court

with law to apply because, "[a]s the Supreme Court noted 'where the rights of

individuals are affected, it is incumbent upon agencies to follow their own

procedures. This is so even where the internal procedures are possibly more

rigorous than otherwise would be required.'" Montilla v. I.N.S., 926 F.2d 162, 167

(2d Cir. 1991) (internal alteration omitted), quoting Morton v. Ruiz, 415 U.S. 199,

235 (1974).

Even when a regulation's adoption was not originally required by the

statute, it can supply the law to apply.

> Though the agency's discretion is unfettered at the
> outset, if it announces and follows – by rule or by

34

> settled course of adjudication – a general policy by
> which its exercise of discretion will be governed, an
> irrational departure from that policy (as opposed to an
> avowed alteration of it) could constitute action that
> must be overturned as 'arbitrary, capricious, or an
> abuse of discretion.

I.N.S. v. Yueh-Shaio Yang, 519 U.S. 26, 32 (1996) (internal alteration omitted),

quoting 5 U.S.C. § 706(2)(A); see also Service v. Dulles, 354 U.S. 363, 388 (1957)

("While it is of course true that under the [statute] the Secretary was not

obligated to impose upon himself these more rigorous substantive and

procedural standards, neither was he prohibited from doing so, . . . and having

done so he could not, so long as the Regulations remained unchanged, proceed

without regard to them."); cf. Guertin v. United States, 743 F.3d 382, 385-86 (2d

Cir. 2014) (examining HUD's regulations to determine whether the agency's

action was arbitrary and capricious).

In this case, upon review of the statute, regulations, and Dear Colleague

Letters, we conclude there is sufficient law to apply to permit judicial review of

the plaintiffs' claims under the APA.  We begin with the statutory text.  The

statute governing false certification discharge provides that if a borrower

received a federally guaranteed student loan and "if such student's eligibility to

borrow under this part was falsely certified by the eligible institution . . . then the

35

Secretary *shall* discharge the borrower's liability on the loan (including interest and collection fees) by repaying the amount owed on the loan."  20 U.S.C. § 1087(c)(1) (emphasis added).  As the Supreme Court has often explained, the use of the word "shall" makes the action mandatory.  See, e.g., Mach Mining, LLC, 135 S. Ct. at 1651 (noting that the language "shall endeavor" is "mandatory, not precatory"); Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109 (2002).  This mandatory, non-discretionary language creates boundaries and requirements for agency action and shows that Congress has not left the decision about the discharge of falsely certified student loans to the discretion of the agency.  The text of the statute alone shows that Congress has mandated that the agency "shall" act in the specified circumstances.

Legislative history strongly supports our reading of the statute as a mandatory command to the agency, not a grant of unbridled discretion.  Cf. Lawrence + Mem'l Hosp. v. Burwell, No. 15-164-CV, 2016 WL 423702, at *8 (2d Cir. Feb. 4, 2016) (relying on legislative history that supports the court's interpretation of the statute's plain meaning).  Congress enacted the law requiring the discharge of debt based on a false certification in response to a report by the Senate Permanent Subcommittee on Investigations and OIG's

36

audits and investigations of trade schools, which documented the widespread

fraud and abuse of federal financial aid to the detriment of student borrowers,

and found that such fraud was allowed to proliferate by the DOE's failure to

perform its regulatory role.  See S. Rep. No. 102-204, at 42 (1991); S. Rep. No. 102-

58 (1991).  Specifically, the Subcommittee found that "[w]idespread abuse and

fraud . . . occur in connection with so-called 'ability to benefit' students" and that

> many of the program's intended beneficiar[i]es –
> hundreds of thousands of young people, many of
> whom come from backgrounds with already limited
> opportunities – have suffered further because of their
> involvement with the GSLP [Guaranteed Student Loan
> Program].  Victimized by unscrupulous profiteers and
> their fraudulent schools, students have received neither
> the training nor the skills they hoped to acquire and,
> instead, have been left burdened with debts they cannot
> repay.

S. Rep. No. 102-58, at 13, 33.

The Subcommittee found that fraud and abuse was able to thrive because

"through gross mismanagement, ineptitude, and neglect in carrying out its

regulatory and oversight functions, the Department of Education had all but

abdicated its responsibility to the students it is supposed to service and the

taxpayers whose interests it is charged with protecting."  Id. at 33.  The report

explained that, although similar issues have been called to the attention of the

37

DOE since at least 1975, "the program's failures seem only to have gotten worse."

Id. at 24-25. In its recommendations, the Subcommittee specifically noted that

> [b]ecause the Department's oversight systems have failed, students who have not received the education promised have been left responsible for loans that they cannot repay and, therefore, on which they all too often default. The Department *must* not only increase efforts to prevent this type of abuse in the future, but also work with students to ease financial burdens imposed as a result of past abuse.

Id. at 37 (emphasis added). The Subcommittee report, which was "strongly reflected in the provisions" of the bill that became the Higher Education Amendments of 1992, see S. Rep. No. 102-204, at 42, shows that Congress was deeply dissatisfied with the manner in which the DOE had failed to exercise its discretion.

Another bill to amend and extend the Higher Education Act of 1965, H.R. 3553, 102d Cong. (1992), was passed by the House, and was the basis for forming a conference committee with the Senate, which agreed to the bill that became the became the Higher Education Amendments of 1992, Pub. L. No. 102-325. See 138 Cong. Rec. 7300 (1992). The House Committee on Education and Labor issued a report on H.R. 3553, which, like the Senate Report on the Senate bill, expressed its intention that the discharge of falsely certified loans be mandatory. "[I]n a case

38

where a borrower's loan is fraudulently certified, the Secretary *shall* discharge the borrower's liability by repaying the amount owed on the loan." H.R. Rep. No. 102-447, at 52 (1992) (emphasis added).

The context provided by the legislative history lends support to our conclusion that in requiring that the Secretary "shall" discharge a borrower's liability on a student loan if the student's eligibility to borrow was falsely certified, 20 U.S.C. § 1087(c)(1), Congress tasked the DOE with a mandatory directive, and did not leave the fate of students who had been "[v]ictimized by unscrupulous profiteers and their fraudulent schools" to the discretion of the DOE whose "oversight systems ha[d] failed." S. Rep. No. 102-58, at 33, 37.

Pursuant to the statute, the Secretary is obligated to promulgate regulations to fulfill the Congressional mandate that student loans obtained by false certification "shall" be discharged. See 20 U.S.C. §§ 1098a, 1070(b). These regulations serve as additional guidance to a court reviewing whether the agency action was arbitrary and capricious. One regulation is directed to guaranty agencies, as the entities in charge of the FFEL program, and another is directed to the DOE for loans under the Direct Loan program.

The regulation concerning the FFEL program, which the DOE has acknowledged also applies to the DOE itself, directs that if the guaranty agency, or the DOE, receives information that "it believes to be reliable indicating that a borrower whose loan is held by the agency *may* be eligible for a [false certification] discharge," then the agency "*shall* immediately suspend" any enforcement efforts to collect from the borrower and "inform the borrower of the procedures for requesting a discharge." 34 C.F.R. § 682.402(e)(6)(ii) (emphasis added). The regulation for Direct Loans provides that if the DOE "determines that a borrower's Direct Loan *may* be eligible for a discharge," it then "promptly suspends" any enforcement efforts to collect from the borrower and "mails" to the borrower a discharge application and an explanation of how to obtain a discharge. 34 C.F.R. § 685.215(d)(1) (emphasis added). Under the regulations governing both loan programs, the guaranty agency and the DOE are directed to consider information available from guaranty agencies, the Secretary's records, state authorities, and accrediting associations. 34 C.F.R. §§ 685.215(d)(3), 682.402(e)(6)(iv).

Although the language in the regulations differs slightly depending on whether the loan was issued under the FFEL program or the Direct Loan

40

program, the obligation is the same: if the loan-holder determines that a borrower "may" be eligible for a discharge, it "shall" suspend any enforcement efforts and inform the borrower about how to request a discharge. The DOE acknowledged that the "FFEL and Direct Loan regulations on false certification discharges have the same rules with respect to a discharge based on an improper determination of the student's ability-to-benefit." 65 Fed. Reg. 46,318.

These regulations provide significant law for a court to apply in reviewing the agency action. From the regulations we learn that the DOE must take certain actions once the agency determines that the borrower "may" be eligible for a discharge, and that in deciding if a borrower "may be eligible," the agency must consider information "it believes to be reliable," including information available from guaranty agencies, the Secretary's records, state authorities, and accrediting associations.[11]

---

[11] The fact that plaintiffs seek relief for multiple borrowers – rather than the singular borrower referenced in the regulations – does not alter this analysis. As plaintiffs argue, "[a]s a matter of logic, where the Secretary or a guaranty agency has knowledge that applies to a group of borrowers, it applies equally to each and every member of the group." Plaintiffs-Appellants' Br. 38. If the DOE has reliable information that the putative class of borrowers may be eligible for a discharge, the DOE has that same information for each individual member of the putative class. That the use of the singular in the regulation is not dispositive to show that the obligations of the agency apply only to individual applications is reinforced by the fact that the regulations that pertain to "group discharges" also refer to borrowers in the singular, even though it is clear those regulations

The DOE argues that these regulations do not provide sufficient guidance for judicial review because the mandatory statute and regulations are triggered by a determination that is left to the agency's discretion: that the DOE "determines" or receives "information it believes to be reliable" that a borrower may be eligible for discharge. Defendant-Appellee's Br. 32-33. It is true that when an agency's "nondiscretionary obligation only arises after a discretionary determination" there may not be sufficient law to apply. See N.Y. Pub. Interest Research Grp. v. Whitman, 321 F.3d 316, 331 (2d Cir. 2003) (holding that the Environmental Protection Agency's decision not to issue a Notice of Deficiency against a third party was not subject to judicial review because the Chaney presumption against judicial review applied and the statutory obligation to issue a Notice of Deficiency was triggered only after a decision that was left to the EPA's discretion).

But even when an agency has some discretion to make an initial decision, judicial review is not precluded if the plaintiffs can show that there is sufficient law to apply to the initial decision, so that a court can evaluate the agency's exercise of its discretion in deciding if the initial triggering condition has been

pertain to a group because they were enacted to allow discharge "without an application." See 34 C.F.R. §§ 682.402(e)(15), 685.215(c)(7).

met. For example, in <u>Westchester</u>, the Court acknowledged that the statute and regulations requiring a "report *satisfactory to the Secretary*" conferred broad agency discretion "as to certain questions." <u>Westchester</u>, 778 F.3d at 421. But the Court rejected the contention that this discretion made the agency's decision unreviewable, because the statute contained "meaningful standards constraining [the agency's] discretion and providing for judicial review." <u>Id</u>. at 422.

In this case, the agency's determination that a borrower "may be eligible for a discharge" triggers its mandatory obligations to suspend collection and notify borrowers. 34 C.F.R. §§ 682.402(e)(6)(ii), 685.215(d)(1). While we recognize the agency has some discretion in making the initial triggering decision, we conclude that this discretion is not unfettered. There is sufficient guidance in the regulations and informal agency guidance for a court to determine whether the agency was arbitrary and capricious in not finding that the putative class of Wilfred borrowers "may be eligible for a discharge," particularly in the context the statute's strong mandatory direction to the agency.

Dear Colleague Letters ("DCLs"), issued by the DOE, instruct guaranty agencies and the DOE concerning what evidence to consider when evaluating an application for discharge. One particularly relevant DCL is dedicated to "Loan

43

discharges based on improper determination that a student had the ability-to-benefit (ATB) from the school's training."  DCL 95-42, at 1.  The guidance in this DCL expressly applies to the DOE itself in evaluating false certification discharges under the Direct Loan program, as well as to the guaranty agencies administering loans under the FFEL program.  Id. ("The Department intends to apply the guidance in this letter to similar false certification discharges in the William D. Ford Federal Direct Loan Program.").  DCL 95-42 directs that

> [i]n evaluating an application for discharge, a guaranty agency [or the DOE] must consider . . . evidence about the testing and admission practices of the school, and inferences that can reasonably be drawn from that . . . evidence.

> . . . [S]upporting evidence can include a finding by an entity or organization that had oversight responsibility over the school's SFA administration or educational programs, statements or admissions by school officials with knowledge of the school's practices, or statements made by other students who attended the school that are both sufficiently detailed and consistent with each other to appear reliable.  Those statements can include statements made in other claims for discharge relief.

> The Department expects a guaranty agency [or the DOE] to obtain existing documentation available from any public or private agency that reviewed or had oversight responsibility for the school.

44

Id. at 5.  This same "type of documentation" is considered by the DOE in

deciding if a group discharge is warranted pursuant to 34 C.F.R.

§§ 682.402(e)(15), 685.215(c)(7).  Id. at 10.  The guidance provided by DCL 95-42

was supplemented in 2007.  DCL 07-09 adds that

> credible evidence of the following provides an adequate
> basis for granting a discharge application . . . : (i)
> withdrawal rates exceeding 33 percent at the school at
> the relevant time, or (ii) . . . an annual loan default rate
> exceeding [a particular percentage, depending on the
> year the student entered repayment on her loans].

DCL 07-09, at 3.

Using the guidance provided by the regulations and DCLs, in the context

of the mandatory language of the statute, a court has sufficient law to apply to

evaluate whether the agency has been arbitrary and capricious in deciding

whether there is "reliable information" that a borrower or borrowers "may be

eligible for a discharge," and thus whether the DOE's mandatory obligation to

suspend collection and send notice has been triggered.  That type of evaluation is

squarely within the competence of the judiciary.  As the Ninth Circuit has

explained, the term "'reliable' . . . does not defy meaningful review . . . [and does

not] involve[] a complicated balancing of a number of factors that are so

peculiarly with the agency's expertise that jurisdiction is necessarily defeated."

Newman v. Apfel, 223 F.3d 937, 943 (9th Cir. 2000).

The regulations and DCLs provide additional guidance by directing the court to the factors and records the guaranty agencies and the DOE rely on in making the triggering determination. The regulations enumerate some factors that the guaranty agencies and the DOE must consider when evaluating discharge applications, including information available from the records of the DOE, guaranty agencies, state authorities, and accrediting associations. And the DCLs provide guidance about other kinds of evidence the DOE requires to be considered both by the guaranty agencies and by the DOE in determining eligibility for discharge, including: testing and admission practices of the school, any findings by an entity or organization that had oversight responsibility, statements or admissions by school officials or students, evidence of withdrawal rates, and loan default rates. See DCL 95-42; DCL 07-09.

The actions the agency has already taken are also relevant to a court's determination of whether the agency acted arbitrarily in not finding the initial triggering condition met. An agency's "irrational departure" from its practice or policy can violate the APA. Yueh-Shaio Yang, 519 U.S. at 32. That factor may be

46

particularly relevant in this case, where the DOE appears to have found

information it has already gathered implicating Wilfred in widespread ATB

fraud reliable enough to require the agency to change its policy for reviewing

discharge applications from students who attended Wilfred schools.  Plaintiffs

plausibly argue that the fact that the DOE has already determined that any

Wilfred borrower who presents a facially valid application alleging false

certification will automatically receive a discharge is powerful evidence that the

DOE has in its possession reliable information that all such Wilfred borrowers

"may" be eligible for a discharge.[12]  We do not suggest that this fact is

dispositive, only that the agency's own actions provide guidance to the court in

judging whether the agency was arbitrary and capricious in determining whether

the members of the putative class "may be eligible for a discharge."  34 C.F.R.

§§ 682.402(e)(6)(ii), 685.215(d)(1).

---

[12] Presumably, not every Wilfred student required, or received, an ATB certification.  But the statute does not require that the DOE know that a borrower *is* eligible for a discharge before the statute is triggered – only that the borrower *may be* eligible.  It is well within the abilities of the district court to determine, based on a full record about the extent of ATB certification fraud at Wilfred, whether it is arbitrary and capricious for the DOE to decline to conclude that the suspension and notification requirement applies, as plaintiffs contend, to *all* Wilfred borrowers.

On further proceedings in the district court, plaintiffs may demonstrate that they are correct that "the Secretary cannot credibly claim that the extensive evidence he possesses about Wilfred's systemic ATB violations is not 'reliable' since he has, in fact, relied on it."  Plaintiffs-Appellants' Reply Br. 12 (citation omitted).  Or the DOE may be able to provide good reasons why it does not have reliable information that Wilfred borrowers, or some sub-group of Wilfred borrowers, "may" be eligible for a discharge, and thus that its mandatory obligations to suspend collection and provide notice have not been triggered.  We do not decide that here.  But we do hold that a court has sufficient law to apply to decide whether the agency was arbitrary and capricious in failing to follow the mandatory direction of the statute and regulations to suspend and notify.

IV.   The Challenged Action of the DOE is Final

To determine whether the challenged agency action is reviewable under the APA we must also decide whether the action is "final."  The APA makes a "*final* agency action for which there is no other adequate remedy in a court . . . subject to judicial review."  5 U.S.C. § 704 (emphasis added).  The Supreme Court has explained that

> two conditions must be satisfied for agency action to be
> 'final': First, the action must mark the consummation of
> the agency's decisionmaking process – it must not be of
> a merely tentative or interlocutory nature. And second,
> the action must be one by which rights or obligations
> have been determined, or from which legal
> consequences will flow.

Bennett v. Spear, 520 U.S. 154, 177–78 (1997) (citations and internal quotation marks omitted).[13] For the second prong, the "core question" is "whether the result of [the agency's decisionmaking] process is one that will directly affect the parties." Sharkey, 541 F.3d at 88. The Supreme Court has interpreted the finality element in a "pragmatic way." Id.; see also Paskar v. U.S. Dep't of Transp., 714 F.3d 90, 97–98 (2d Cir. 2013) (considering the "substantial practical impact" of an agency's letter in deciding if it was a final agency decision).

---

[13] The DOE asserts that "a challenge to agency action may proceed under the APA only if the agency action is '*discrete*.'" Defendant-Appellee's Br. 38, quoting Norton v. S. Utah Wilderness All., 542 U.S. 55, 64 (2004) (emphasis in original). The requirement that the challenged agency action is "discrete" is limited to claims under 5 U.S.C. § 706(1), and on appeal plaintiffs argue for review under 5 U.S.C. § 706(2)(A). See Sharkey v. Quarantillo, 541 F.3d 75, 89 n. 13 (2d Cir. 2008) (applying the "discrete" requirement only to plaintiff's 706(1) claim). Even if this requirement did apply to plaintiffs' claims, we would find it met because the challenged agency actions are sufficiently specific and are not a complaint of "[g]eneral deficiencies in compliance" or a request for "*wholesale* improvement of this program by court decree." Norton, 542 U.S. at 66, 64.

The APA's finality requirement is satisfied here. The DOE does not dispute that the first condition for finality is met. The DOE's refusal to suspend loan collection and send notice was "the consummation of the agency's decisionmaking process" with respect to the suspension and notice relief sought by the plaintiffs. Bennett, 520 U.S. at 178 (internal quotation marks omitted).

The second requirement of the Bennett test is also met, because legal consequences flow from the DOE's decision not to suspend the collection of the loans of the putative class members. The borrowers during the time of the suspension would not have the legal obligation to make payments and the DOE could not garnish wages or direct tax refund offsets. The fact that the suspension is temporary does not undermine the fact that the decision to suspend or not to suspend is a final agency action because the action "had an immediate and substantial impact upon the complaining party." Aquavella v. Richardson, 437 F.2d 397, 403–404 (2d Cir. 1971) (concluding that the suspension of Medicare payments was final agency action). Further, suspending the repayment of loans of Wilfred borrowers who may be eligible would also have legal consequences for the DOE, which otherwise has the non-discretionary mandate to collect on federal student loans. See 31 U.S.C. § 3711(a)(1).

50

We also conclude that the agency's decision is "final" as to its refusal to send notices to members of the putative class. The DOE's decision not to send notices to Wilfred borrowers, or some subset of Wilfred borrowers, about their potential eligibility to have their Wilfred student loans discharged if the loans were procured by ATB fraud, finally determined that members of plaintiffs' putative class do not have a right to receive such a notice. Bennett, 520 U.S. at 178 ("[T]he action [is] one by which rights . . . have been determined." (internal quotation marks omitted)).

The decision that the agency is not required to send notice also has a "substantial practical impact." Paskar, 714 F.3d at 97. Without notice, plaintiffs plausibly allege, it is likely that most of the at least 61,300 Wilfred borrowers will continue to be unaware that they can apply to the DOE for a discharge and not know of the conditions under which the DOE will grant the request. Indeed, the DOE's own rulemaking acknowledged this reality when it cited the fact that "many [borrowers] may be unaware of the possibility of receiving a loan discharge" as a reason for the implementation of a group discharge regulation. 65 Fed. Reg. 46,318. That acknowledgment, along with the plaintiffs' allegations, which we must accept as true, belie the DOE's contention that because some

51

individuals have managed to contact plaintiffs' counsel and find out about false certification discharge and because the government maintains a website with information about discharge rights, the provision of notice would not have a substantial practical effect on the plaintiffs' ability to exercise their rights.[14]

We recognize that even if the DOE is required to suspend collection and send notice to putative class members, further proceedings in the agency on related issues will be required before the DOE will discharge any individual's loan obligation. See 34 C.F.R. § 682.402(e)(3) (explaining that to qualify for a discharge of a FFEL loan "the borrower must submit to the holder of the loan a written request and a sworn statement"); id. § 685.215(c) (same for a Direct Loan). That does not make the decision the DOE did make – to not provide notice or suspend collection – any less final. The APA does not require that the challenged agency action be the agency's final word on the matter for it to be

[14] *Amici curiae*, organizations that provide legal services to low-income consumers, allege that in their experience "student loan borrowers who attended for-profit schools are almost universally unaware whether they are eligible for one or more of the discharges provided by the Higher Education Act." Br. For East Bay Community Law Center et al. as Amici Curiae Supporting Plaintiffs-Appellants 4. *Amici* also point out that there is very little help available for low-income people seeking legal assistance with any type of consumer issue. Id. at 13–14 (citing Task Force to Expand Access to Civil Legal Services in N.Y., *Report to the Chief Judge of the State of New York* 16 (2010), finding that only one percent of New York City residents sued on a consumer debt were represented by counsel).

"final" for the purposes of judicial review.  See Sackett v. E.P.A., 132 S. Ct. 1367, 1372 (2012).  "[T]he agency's action is final notwithstanding '[t]he possibility of further proceedings in the agency' on related issues, so long as 'judicial review at the time [would not] disrupt the administrative process.'"  Sharkey, 541 F.3d at 89, quoting Bell v. New Jersey, 461 U.S. 773, 779–80 (1983).

Here, even if plaintiffs were granted the relief they seek, there is the possibility of further proceedings in the agency because the agency would have to process applications of individuals who apply for a discharge, unless the agency were to use its discretion to grant a group discharge.  Plaintiffs, however, do not seek to require the DOE to grant discharges, or contend that all members of their proposed class are entitled to such discharge.  All they claim is a right to notice and suspension as provided by statute.  As to that claim, the DOE's decision not to afford such notice and suspension is final.  Because the two requirements of the Bennett test are met, and judicial review would not disrupt any ongoing administrative process, the agency action is final, and thus reviewable under the APA.

**CONCLUSION**

For the foregoing reasons the judgment of the district court dismissing plaintiffs' complaint is VACATED and the case is REMANDED for further proceedings consistent with this opinion, including consideration of plaintiffs' class certification motion.